LINDA BELL-KACHELSKI,

        Plaintiff,

v.                                      Case No. 16-14157

MICHIGAN PROTECTION & ADVOCACY
SERVICE, INC.,

and

MICHIGAN REHABILITATION SERVICES

        Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT ON COUNT I AND DISMISSING WITHOUT PREJUDICE COUNTS II-V**

        This is an Americans with Disabilities Act (ADA) case in which Plaintiff Linda Bell-Kachelski's alleges discriminatory treatment by two organizations designed to provide services to and advocate for disabled individuals. Plaintiff claims Defendant Michigan Rehabilitation Service ("MRS") and Defendant Michigan Protection & Advocacy Service ("MPAS") denied her services and benefits, and failed to provide reasonable accommodations, because of her cognitive disabilities. Plaintiff's complaint also includes four counts alleging that Defendants violated various state laws.

        Both Defendants filed Motions for Summary Judgment. (Dkt. # 21 & # 22.) Plaintiff has responded (Dkt. # 24 & # 25) and Defendants have replied. (Dkt. # 26 & # 27.) The court has duly considered all of the parties' briefing and conducted oral argument on November 1, 2017. See E.D. Mich. LR 7.1(f)(2).

Plaintiff's federal claim is unsustainable and will be dismissed.  Plaintiff's remaining claims are also dismissed, though without prejudice to Plaintiff's right to restate those claims in state court.

## I. BACKGROUND[1]

Plaintiff alleges that she suffers from a permanent cognitive disability that prevents her from working all day within large groups.  Plaintiff learned sign language as a child from her mother. She has provided sign language services as a home health care provider since 2006 and also conducted her own business from 2005-2010 as an independent contractor providing sign language interpreting services.

The Division on Deaf and Hard of Hearing ("the Division") within the Michigan Department of Civil Rights administers the certification process for interpreters for deaf and hard of hearing individuals.  Plaintiff worked as an interpreter pursuant to the Division's quality assurance certificate program, but in 2007, Michigan began to phase out the quality assurance system in an effort to strengthen its certification requirements for interpreters.

In 2011, the Director of the Division, Shery Emery, notified Plaintiff that her quality assurance certificate was going to expire and she would need to obtain certification from the Board of Evaluation of Interpreters ("BEI"). In order to obtain said certification, Plaintiff would be required to pass the Test of English Proficiency ("TEP").

---

[1] Although the factual record in this case is extensive, covering a period of nearly five years, and involving numerous individuals and entities, the great majority of the facts are agreed upon by the parties and have been stated as such unless otherwise indicated.

The TEP is the only educational requirement for BEI certification. Because Plaintiff had failed the TEP on two prior occasions, Emery expressed concern that ineffective communication by Plaintiff could jeopardize the legal rights and health of deaf persons receiving her services.

In 2012, Plaintiff submitted a letter to the Division from a psychiatrist stating that she had performance anxiety and requesting a testing accommodation from the Division for the TEP. The Division denied her request because it found she had not sufficiently documented a qualifying disability.

In November 2012, Plaintiff contacted Defendant Michigan Protection and Advocacy Service, Inc. ("MPAS") and requested assistance regarding the Division's denial of her accommodation request. MPAS is a private, non-profit organization that exists to advocate for and protect the rights of individuals with disabilities. MPAS provides attorneys to represent individuals with meritorious claims that are within MPAS' program priorities. Separately, MPAS also has a Client Assistance Program ("CAP") that is staffed by non-attorney advocates who assist persons in receiving rehabilitation services, services for the blind, and independent living services.

On November 26, 2012, Plaintiff signed a MPAS retainer agreement to have MPAS investigate the Division's denial of her testing accommodation request. MPAS attorney Nicole Shannon was assigned to the file. After conducting research into whether test anxiety could be considered a disability under the ADA, Shannon concluded that she did not have the support she needed to represent Plaintiff and closed her file.

On April 19, 2013, Plaintiff sought assistance from Defendant Michigan Rehabilitative Services ("MRS"), a division of the Michigan Department of Health and Human Services designed to help individuals with disabilities obtain and retain suitable employment. In order to obtain MRS' services, an individual must enter into an Individualized Plan for Employment ("IPE") with an assigned counselor. An IPE is a signed agreement between the client and MRS identifying the employment goal and the services required to achieve said goal.

Plaintiff indicated to MRS that she wished to finish her bachelor's degree in order to become an interpreter. Plaintiff's assigned counselor, Wendy Hilliker, referred her to a psychologist, Harold Sommerschield, for a vocational assessment. Dr. Sommerschield determined that Plaintiff's anxiety symptoms in combination with her below average intellectual functioning warranted test-taking accommodations both for her college exams and the TEP.

On May 3, 2013, Plaintiff inquired to Hilliker whether MRS would fund the college courses she recently began. Hilliker explained that MRS has a process that requires certain documentation before Plaintiff is eligible for that type of assistance. At the time, Plaintiff was enrolled in *English 112: Critical Writing & Reading* at The University of Michigan- Flint, a class which she ultimately failed.  Plaintiff re-took *English 112* in the spring semester of 2013 and again failed. It is unclear whether she received testing accommodations for that course.

In June 2013, Hilliker stressed to Plaintiff the importance of developing her IPE.

On July 30, 2013, Plaintiff again contacted MPAS this time about her dealings with MRS. Plaintiff complained that MRS had not sent Dr. Sommerschield's findings to the Division and thus Plaintiff had not received a testing accommodation for the TEP. In accordance with MPAS's standard procedure, Plaintiff signed a retention letter, which stated that MPAS would "investigate [the] status of accommodation documents requested from (MRS). . . [but] ha[d] not agreed to represent [Plaintiff] in this or any other matter." (Dkt. # 21-9.) MPAS then assigned one of their non-attorney CAP advocates, Lisa Knapp, to Plaintiff's file. Knapp contacted Hilliker, Plaintiff's counselor at MRS, regarding the situation. Hilliker explained that Plaintiff needed to contact Dr. Sommerfield directly to have his letter sent to the Division. Knapp documented the above information in a letter to Plaintiff on Sept. 3, 2013 and closed Plaintiff's MPAS file.

On August 1, 2013, Dr. Sommerschield faxed a letter containing his findings to the Division. As a result, Plaintiff was provided 50% more testing time on August 2, 2013 when she took the TEP. She nonetheless failed the exam, this for the third time.

On August 15, 2013, Hilliker met with Plaintiff to discuss her failures at the University and on the TEP. Because Plaintiff's most recent attempt to pass *English 112* had been during a shortened spring semester, Hilliker believed her failure did not accurately represent her abilities. Consequently, MRS agreed to provide funding for Plaintiff to take *English 112* again as an assessment. Hilliker told Plaintiff that if she passed the English course, "college will be discussed but no guarantee that MRS will continue to pay for classes." (Dkt. # 25, Pg. ID 792.) Hilliker advised Plaintiff that if she did not pass, MRS would still help her obtain employment, but not as an interpreter. It

appears that both Plaintiff and Hilliker incorrectly believed that a bachelor's degree was required to obtain BEI certification. It is unclear who led whom to that conclusion. On Sept. 6, 2013, MRS approved $1,677.22 to assist Plaintiff with her tuition on an assessment basis.

On October 1, 2013, Plaintiff went to MRS to see if Hilliker was available to meet. Plaintiff alleges that she overheard an unknown female Caucasian MRS receptionist state, "the nigger is here at five to five, trying to make trouble." Plaintiff also alleges that the MRS receptionist stated "[y]ou people are always here five minutes before five . . . niggers."

MRS claims that Plaintiff arrived at MRS shortly before five and that the receptionist told Plaintiff that Hilliker was not there because thought that Hilliker had left for the day. Hilliker testified that she was using the front copier at the time and overheard the receptionist arguing with someone at the front desk. The receptionist came to Hilliker and allegedly told her that Plaintiff wanted to speak with her. Hillliker claims that Plaintiff then yelled "I heard that," stated that the front desk person was rude, and left. Hilliker tried calling Plaintiff the next morning, but did not reach her.

On October 4, 2013, Plaintiff met with Hilliker and the MRS site manager Don Dees. Hilliker explained that she meant no disrespect to Plaintiff by not coming to the front desk. She was busy packing up files that she needed and did not expect Plaintiff to drop by unannounced. Plaintiff requested a new counselor and Dees refused to assign one. Hilliker tried to schedule a weekly phone call with Plaintiff, but she declined and stated that she did not want to talk with a MRS counselor until the semester ended.

On October 10, 2013, Plaintiff contacted MPAS CAP's office requesting help for a third time. Plaintiff told MPAS that a MRS receptionist referred to her using a racial slur, that her MRS counselor Hilliker did nothing about it, and that MRS site manager Dees refused to transfer her to a new counselor. MPAS CAP advocate Lisa Knapp was again assigned to Plaintiff's file. Knapp contacted Hilliker who relayed MRS' version of the events. Knapp explained MRS position to Plaintiff and closed her file.

During this time, Plaintiff remained enrolled at the University of Michigan-Flint. In fall 2013, Plaintiff completed these University of Michigan courses: *Introduction to Technology* and *American Ethnic Literature, Hip Hop, and The Black Family*. In the winter 2014 semester Plaintiff took these courses: *Dance Topics: Yoga, College Reading & Learning Strategy*, *Jazz I*, *Basic Stress Management/Relaxation*, *Black Arts Movement*, and *College Writing Workshop*.

In early 2014, Hilliker expressed concern regarding Plaintiff's curriculum. Plaintiff needed 33 credits at the 300 level to complete her degree, but had only taken one such course. Hilliker informed Plaintiff that MRS would not fund course electives, except those necessary to complete a specific degree program. Most importantly, Hilliker advised Plaintiff that she needed a signed IPE before MRS could provide any further financial support for her college degree.

Hilliker kept a record of what she viewed as problems with Plaintiff providing requested information and documentation for the development of her IPE. Hilliker explained that Plaintiff's IPE could not be completed because she often arrived late to

meetings and only stayed 10-15 minutes before abruptly leaving. Plaintiff claims this behavior is symptomatic of her disability.

On February 7, 2014, Plaintiff asked for a written statement as to why MRS would no longer provide funding for her college tuition. Hilliker sent Plaintiff a letter on February 13, 2014 outlining deficiencies in Plaintiff's file and setting a deadline of February 28, 2014 for a response in which Hilliker requested that Plaintiff identify the next steps she would like to take in her vocational rehabilitation program.

Sometime in February 2014, Plaintiff contacted MPAS again this time requesting help with MRS' denial of her college tuition funding. Lisa Knapp was assigned to Plaintiff's file again. Knapp spoke again with Hilliker who relayed MRS policy against providing further college funding absent a signed IPE.

Through Knapp's own research, she discovered that a bachelor's degree is not required to obtain BEI certification. Knapp relayed her belief to Plaintiff that MRS was not obligated to pay for Plaintiff's tuition in light of this fact. Knapp also informed Plaintiff that MRS' had a policy against retroactive payment of tuition for courses already taken. Plaintiff reiterated her desire to change MRS counselors.

On February 21, 2014, Plaintiff contacted Hilliker and requested that MRS pay the fee for her to re-take the TEP examination. Hilliker did not believe that Plaintiff would succeed in the job goal of interpreter and tried to discuss other career options, in which Plaintiff had no interest.

On March 26, 2014, Plaintiff met with Donald Dees (the MRS site manager), Hilliker (her assigned MRS counselor), Knapp (her MPAS CAP advocate), Brian

Sabourin (Knapp's supervisor at MPAS), and Charlie Rose (a new MPAS CAP employee). Knapp memorialized the following agreements reached at the meeting in a letter ("the April 3 letter"): that MRS would fund Plaintiff's enrollment in *English 112* in fall 2014 as an assessment of Plaintiff's ability to proceed with college coursework, MRS would develop an IPE with the goal employment of interpreter and continue to fund Plaintiff's college tuition if Plaintiff passed *English 112*, MRS would pay the fee for Plaintiff to re-take the TEP examination, and MRS would assign Plaintiff a new counselor. MRS alleges that it additionally told Plaintiff it would not fund any spring or summer coursework.

On April 29, 2014, Plaintiff met with her new MRS counselor, Vanessa Neilley, to seek financial assistance from MRS for spring and summer coursework. On June 16, 2014, Neilley advised Plaintiff that MRS would not fund *English 112* as a summer course because Plaintiff had previously not performed well in shortened spring/summer courses. Neilley also allegedly made a notation in Plaintiff's file questioning why MRS was paying for her college coursework at all since it was not necessary for her to become an interpreter.

Plaintiff asked MRS for a letter explaining wny MRS would not fund her bachelor's degree in Africana Studies. Neilley provided a letter explained MRS policy and the goal of finding work for Plaintiff.

On June 17, 2014, Plaintiff contacted MPAS for a fifth time, now requesting help regarding MRS' refusal to fund her summer coursework. Knapp no longer worked for MPAS, and MPAS CAP advocate Charlie Rose was assigned to Plaintiff's file. Rose

contacted Neilley who explained MRS' position regarding summer courses as well as his concern regarding MRS providing funding for Plaintiff's degree at all. Rose concluded that because Plaintiff did not have a signed IPE with MRS, there was not anything MPAS could do to help her. However, Rose mistakenly reported in Plaintiff's file that Plaintiff did have a signed IPE with MRS, but it did not include funding for *English 112* as a summer course. Rose closed Plaintiff's MPAS file. Nonetheless, Plaintiff enrolled in *English 112* in the summer of 2014 and failed it for the third time.

On June 19, 2014, Plaintiff indicated that she was seeking legal counsel and wanted all communications with MRS in writing. Neilley attempted to meet with Plaintiff three times to develop her IPE and Plaintiff refused. Plaintiff requested a new counselor.

On August 20, 2014, Plaintiff called Neilley inquiring if MRS would pay for her classes beginning in September. Neilley explained that the notice was very late and she was concerned that the classes were not necessary for Plaintiff to reach her goal of becoming an interpreter.

Neilley allegedly met with MRS site manager Don Dees in August 2014 to discuss Plaintiff's file. The pair concluded that MRS should not fund Plaintiff's *English 112* class in the fall considering that she had already taken the course that summer and it was not necessary to obtain her interpreter certification.

On August 26, 2014, Neilley advised Plaintiff that MRS would not financially support her efforts to obtain her bachelor's degree; however, MRS would be willing to fund her efforts to pass the TEP and obtain her BEI certification. Neilley emphasized the need for Plaintiff to sign an IPE. Neilley requested that a manager be present for all

future meetings with Plaintiff because she was deemed "very aggressive and very confrontational."

Neilley allegedly sent Plaintiff a letter scheduling a meeting for Sept. 4, 2014, which Plaintiff alleges she did not receive. Plaintiff did not attend the Sept. 4, 2014 meeting and as a result Neilley closed her file on Sept. 8, 2014. Neilley advised Plaintiff of the procedure to appeal the closure of her file, which Plaintiff did. Following Plaintiff's appeal, Dees directed Neilley to reopen her file on October 24, 2014.

On November 14, 2014, Plaintiff met with Neilley to discuss steps moving forward. Plaintiff stated that she "was not going to play this game" because Neilley knew "what she wanted from MRS" and that it was clear to her that MRS was "not going to give her what she wanted"  and MRS was "denying her MRS  services." (See Dkt. # 22, Pg. ID 509; Dkt. # 25, Pg. ID 804-805.) Plaintiff declared the meeting over and walked out. Plaintiff called Neilley a week later to apologize for her behavior.

As a result of Plaintiff's meeting with Neilley and Dees on November 21, 2014, MRS agreed to fund Plaintiff's *English 112* course in the winter 2015 semester since it had previously indicated that it would do so and because the course should improve Plaintiff's English proficiency in preparation for the TEP examination. MRS also agreed to assist her with the TEP examination fees if she passed *English 112*. Dees indicated that MRS could not fund any courses without a signed IPE unless the course was for assessment purposes only.

On January 12, 2015, Plaintiff came to the MRS office to collect authorizations for the *English 112* tuition and to sign an IPE. However, Plaintiff refused to sign the IPE

because it contained the statement, "I understand that MRS is not supporting my academic pursuit of a Bachelor's Degree." Neilley did not release the funding authorizations due to Plaintiff's refusal to sign the IPE.

Neilley reconsidered and left a voice message for Plaintiff indicated that MRS would remove the cited language from the IPE. Neilley alleges that Plaintiff returned her call and continued to refuse to sign the IPE unless specific language was inserted into the IPE stating that MRS was supporting her efforts to obtain her degree. Plaintiff denies making such demands. MRS advised Plaintiff that it could not proceed to help her without a signed IPE. Plaintiff never signed an IPE.

Plaintiff did not enroll in *English 112* in the winter 2015 semester, but instead took *African Cultures, Applied Science Senior Seminar,* and *Topics: Hip Hop II and Modern Dance I.* Plaintiff called Neilley requesting MRS pay $3,000 in fees that she said she incurred due to registering for and then dropping numerous classes. MRS alleges that Plaintiff did not provide proper proof or documentation of the fees.

On February 13, 2015, Plaintiff contacted MPAS yet again requesting help with MRS. MPAS CAP advocate Brian Sabourin was assigned to Plaintiff's file. Based on the notes from Plaintiff's prior CAP advocate, Charlie Rose, Sabourin mistakenly believed that Plaintiff had a signed IPE with MRS that did not include support for *English 112*. Sabourin advised Plaintiff to continue working with MRS to obtain services to aid her in acquiring her BEI certification, rather than her bachelor's degree, and proceeded to close her MPAS file.

On March 23, 2015, Plaintiff contacted Neilley at MRS and inquired about the alleged signed IPE which Sabourin from MPAS had incorrectly told Plaintiff existed. Neilley told Plaintiff that she did not have a signed IPE on file with MRS, but that she could still sign the draft IPE previously discussed in January 2015.

On April 7, 2015, Neilley wrote Plaintiff indicating that MRS would help her obtain her interpreter's license and scheduled a meeting for April 17, 2015. Plaintiff alleges that on April 11, 2015, she notified Neilley in a letter that she would not meet with MRS because MRS had violated the Americans with Disabilities Act in its treatment of her case. MRS denies receiving such letter.

Plaintiff did not attend the April 17, 2015 meeting. Neilley rescheduled it for May 1, 2015. Plaintiff did not attend that meeting either and Neilley closed her file. Neilley advised Plaintiff of her ability to appeal the decision within the Department of Health and Human Services.

On October 14, 2016, Plaintiff filed the instant action against MPAS and MRS alleging: (1) violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12132 & 12182; (2) violation of the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"), Mich. Comp. Laws § 37.1201 et seq., (3) violation of the Elliot Larsen Civil Rights Act ("ELCRA"), Mich. Comp. laws § 37.2101 et seq., against Defendant MRS only, (4) malpractice against Defendant MPAS only, and (5) civil conspiracy.

## II. STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F. 3d 493, 497 (6th Cir. 2003). The movant has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]hat burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Bennett v. City of Eastpointe*, 410 F. 3d 810, 817 (6th Cir. 2005) (internal quotation marks omitted).

The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F. 3d 906, 909 (6th Cir. 2004) (citation omitted). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). In evaluating a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . . credibility judgments and weighing of the evidence are prohibited." *Moran v. Al Basit LLC*, 788 F. 3d 201, 204 (6th Cir. 2015) (internal quotation marks and citations omitted)

## III. DISCUSSION

### A. Title II of the ADA

Title II of the ADA declares that,

> "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

A public entity is

(A) any State or local government;

(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and

(C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 24102(4) of Title 49) 42 U.S.C. § 12131(1).

The regulations interpreting Title II state,

A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 35.130(b)(7)(i).

"Services, programs, or activities" under Title II of the ADA encompass virtually everything a public entity does. *See Anderson v. City of Blue Ash*, 798 F. 3d 338, 357 (2015) (citing *Tucker v. Tennessee*, 539 F. 3d 526, 532 (2008); *see also* 28 C.F.R. § Pt. 35, App. B. "To establish a prima facie case of intentional discrimination under Title II of the ADA, a plaintiff must show that: (1) she has a disability; (2) she is otherwise qualified; and (3) she was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of her disability." *Id.* For purposes of the ADA, a disability is "a physical or mental impairment that substantially limits one or more of the major life activities of [the] individual" and must include "a record of such an impairment; or being regarded as having such an impairment." *See*

42 U.S.C. § 12102(2)(A)-(C). To be considered qualified, the plaintiff must be an individual with a disability

> who, with or without reasonable modifications to rules, policies, or practices, the removal of architecture, communication, or transportation barriers or the provision of auxiliary aids and services, meets the essential eligibility requirements for receipt of services or the participation in programs or activities provided by a public entity. 42 U.S.C. § 12131(2).

To show that she was subject to discrimination *because of* her disability, a plaintiff must "present evidence that 'animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive.'" *Turner v. City of Englewood*, 195 F. App'x 346, 353 (6th Cir. 2006) (citing *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002)) (emphasis removed). The discrimination need not be solely because of the plaintiff's disability, *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315 (6th Cir. 2012), but the defendant must have intentionally discriminated against the plaintiff. See *Anderson*, 798 F.3d at 357-358 (affirming the district court's finding no discriminatory intent where the city's actions were motivated by citizen complaints) *accord Dillery v. City of Sandusky*, 398 F.3d 562, 568 (6th Cir. 2005).

### 1. Defendant MRS

Plaintiff alleges that Defendant MRS discriminated against her in violation of Title II of the ADA. Specifically Plaintiff complains that MRS did not honor the promises articulated in the April 3, 2014 letter from MPAS and MRS' failure is attributable to animus toward her cognitive disabilities. The alleged promises included (1) "MRS will

pay for the fee for you to re-take your Michigan BEI exam;" (2) "MRS will pay for you to take *English 112* at U of M Flint as an assessment of your ability to proceed with college coursework;" (3) "If you pass *English 112*, MRS will develop an IPE with the goal of Interpreter and continue to pay for your full time enrollment at U of M Flint to complete her [sic] Bachelors degree;" and (4) "MRS will assign you to a new counselor." (Dkt. # 25-2.)

Plaintiff's Title II ADA claim against Defendant MRS fails for two reasons.

First, Plaintiff has not shown that she was "otherwise qualified" to receive the services that MRS denied her. Defendant correctly points out that a letter from *MPAS*, signed *only by a MPAS* representative does not, without more, bind MRS and cannot serve as proof that Plaintiff was qualified or entitled to receive the MRS services described therein. Defendant MRS explains that "Plaintiff admits the critical and dispositive fact that she never developed an IPE or signed one. Without that predicate step, MRS could never get beyond the assessment level for Plaintiff." (Dkt. #22, Pg. ID 518.)

Plaintiff does not dispute that to be entitled to MRS' financial aid for college courses, an individual must have a signed IPE. *See* Dkt. # 25, Pg. ID 805 ("Plaintiff admits that Dees explained that without a completed IPE, MRS is prohibited from paying for any services (other than services necessary to complete an assessment)."). She does not dispute that she knew she needed a signed IPE before she could obtain funding for her *English 112* course. *Id.* ("Plaintiff admits that she received a letter from Neilley advis[ing] her that 'no authorizations will be generated until we have a signed

IPE in place.'"). Plaintiff was informed numerous times of the importance of having a developed IPE.[2]  Plaintiff admits that she never signed an IPE. (*Id.* at 805, 807.)

In sum, Plaintiff failed to comply with MRS' standard policy that requires any individual it serves to develop and sign an IPE before it authorizes any non-assessment financial assistance. Therefore, Plaintiff was not otherwise qualified to receive further services from MRS. *See Burns v. Coca-Cola Enterprises, Inc.*, 222 F.3d 247, 258 (6th Cir. 2000) (holding that a disabled individual who failed to comply with the defendant's non-discriminatory policy that was a prerequisite for anyone wishing to obtain the services/benefits Plaintiff sought could not maintain an ADA claim against defendant because to hold otherwise would convert the ADA "into a mandatory preference statute").

---

[2] While "Plaintiff denies that MRS advised Plaintiff the importance of developing and signing an IPE" (Dkt. # 25, Pg. ID 807), Plaintiff admits facts in *thirteen* other instances in her brief that demonstrate she fully understood the importance of developing an IPE. *See* Dkt. #25 (Plaintiff attended numerous independent vocational assessments "in order to develop her IPE" (Pg. ID 790); Plaintiff met with MRS for "the purpose of 'plan development action'" (Pg. ID 791); Plaintiff admits that MRS initially gave her tuition assistance without an IPE because it was for an assessment (Pg. ID 792); Plaintiff admits she received a message from MRS requesting a meeting to develop a plan (Pg. ID 797); Plaintiff admits her millage reimbursement request was denied "until there was an approved IPE in place" (Pg. ID 798); Plaintiff admits MRS believed Plaintiff was having trouble  remembering "the need to develop her IPE" (Pg. ID 798); Plaintiff admits her counselor informed MRS management that "Plaintiff's IPE was overdue" (Pg. ID 798);  Plaintiff admits that MRS attempted to schedule an appointment with Plaintiff "in order to develop an IPE" (Pg. ID 802); Plaintiff admits that MRS told her the focus should be on "completing her IPE" (Pg. ID 803); Plaintiff admits that MRS explained it could not pay for any services "without a completed IPE" and that "no authorizations will be generated until we have a signed IPE in place." (Pg. ID 805); Plaintiff admits MRS confirmed to Plaintiff that "MRS would not proceed without a signed IPE" (Pg. ID 806); Plaintiff admits that MRS advised her "that failure to have a valid IPE in place" would result in closure of her case (Pg. ID 806); and Plaintiff admits that MRS advised her "it

Second, even if the court assumed that Plaintiff was denied services for which she was otherwise qualified to receive, Plaintiff has failed to show that any services MRS denied her were due to animus toward her cognitive disability. Plaintiff argues that the very fact that MRS denied her services is evidence that MRS denied her services due to animus toward her disability. At the hearing on Defendant's motion, Plaintiff's counsel reaffirmed this argument. When questioned by the court regarding whether any specific facts evince discrimination, counsel pointed to MRS' alleged denial of services and argued that the "totality of the circumstances" show a discriminatory intent. Plaintiff's argument is circular. The ADA requires a party to prove she was denied services *and* that the denial was because of individual's disability. The denial of services itself, without more, does not fulfill both of those requirements. At the hearing, Plaintiff's counsel asserted that MRS refused to send Dr. Sommerschield's letter to the Division and that this refusal is a denial of services that cannot be explained by anything other than a discriminatory intent. The court is unpersuaded by this line of argument.

Plaintiff mischaracterizes the record; MRS' actions regarding Dr. Sommerfield's assessment do not constitute a denial of services, let alone a denial that can only be explained by discriminatory intent. Plaintiff does not dispute that MRS gave her "Dr. Sommerschield's contact information . . . and recommended [P]laintiff contact him directly to obtain a copy of his assessment." (Dkt. # 21-1, Pg. ID 135, ¶ 14; Dkt. # 24, Pg. ID 710, ¶ 14.) MRS' business file record, which was documented contemporaneously with Plaintiff's case, states that MRS explained it "could not provide

could not proceed without an IPE." (Pg. ID 807).

the Psychological/Vocational Assessment. [Plaintiff] was informed that she would need to contact Harold Sommerschield Psychologist to get a letter about accommodations to send to [the Division] because [MRS] did not feel it was necessary or [in the] best interest of [Plaintiff] to send [the] entire assessment. [MRS] explained to [Plaintiff] that most likely the psychologist will need her to come in and sign a release to send the letter to [the Division], if she need[s] a letter could be sent but it would be better to have the Psychologist send the information." (Dkt. #22-6, Pg. ID 613-614.) Far short of refusing to help Plaintiff, MRS staff explained why obtaining a letter from Dr. Sommerschield's office directly would be more beneficial to Plaintiff and provided Plaintiff with the information she needed to obtain Dr. Sommerschield's assessment and letter.[3] Ultimately, Plaintiff received the full benefit to be gained by MRS' services because the Division received Dr. Sommershield's letter[4] and Plaintiff was given a testing accommodation as a result. Given these facts, MRS' actions do not constitute a refusal to provide Plaintiff services. Moreover, these undisputed facts do not support

---

[3] Although not necessary to support the court's conclusion, MPAS' documentation of its investigation of the matter on Plaintiff's behalf provides further illumination. According to MPAS records, MRS "explained to [Plaintiff] why she should request this [letter] from the psychologist who completed her assessment. . . [MRS] recommended to [Plaintiff] that she request a test accommodation needs letter from the psychologist instead of providing the State with a copy of her assessment because the assessment document had information beyond what the State needs that may not be in the best interest of [Plaintiff] to provide." (Dkt. #21-23, Pg. ID 370.) "[B]ecause of the psych [sic] information . . . [MRS] could not release the document to [Plaintiff], but [Plaintiff] could request a copy from the psychologist." (*Id.*) MRS "provided [Plaintiff] with contact information for the psychologist to request a copy of her assessment or a statement indicating client needed a test accommodation." (*Id.*)

[4] It is worth noting that Dr. Sommerschield assessed Plaintiff in the first instance due to MRS' referral.

counsel's assertion that MRS denied Plaintiff services and the denial can only be explained by a discriminatory intent. Plaintiff has not alleged facts regarding MRS' treatment of Dr. Sommerschield's assessment and letter that give rise to an inference of discriminatory intent based on Plaintiff's disability. *See Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015) ("Plaintiff must present evidence that animus against the protected group was a significant factor in the position taken by the [Defendant].") (quoting *Turner*, 195 Fed. Appx. at 353).

Moreover, Defendant MRS in fact provided many services to Plaintiff over the course of two years, including referral for a vocational assessment, career counseling, and funding for assessment college courses. Plaintiff herself provides a non-discriminatory reason for those services MRS' denied. She states that "the closing of her file was done after Plaintiff sought to have Defendant [MRS] live up to their agreement as of April 3, 2013." (Dkt. # 25, Pg. ID 818.) MRS provides non-discriminatory reasons for not "living up" to the conditions in the April 3rd letter. MRS explained that it could not provide Plaintiff funding on a non-assessment basis without a signed IPE. MRS also explained that its policies do not allow it to fund services that are not necessary to achieve an individual's identified career goal and that MRS' position changed when it discovered that a college degree is not necessary for Plaintiff to obtain her interpreter's license and achieve her identified career goal. Plaintiff advances no evidence of discriminatory motive to rebut these non-discriminatory rationales.

For all of the above reasons, Plaintiff has failed to raise a genuine issue of material fact as to whether Defendant MRS denied her services "by reason of" her alleged cognitive disability and thus, her Title II ADA claim against Defendant MRS fails. *See* 42 U.S.C. § 12132.

## 2. Defendant MPAS

Plaintiff has failed to raise a genuine issue of material fact indicating that Defendant MPAS denied her services and benefits "by reason of" her alleged disability in violation of Title II of the ADA.[5] *See* 42 U.S.C. § 12132. Plaintiff alleges that the "sequence of events" show a "continuous pattern of animus" against Plaintiff by MPAS. (Dkt. # 24, Pg. ID 725.) She identifies four facts as a evincing a discriminatory pattern of denial of service by MPAS. First, her response brief directs the court to an instance when she was allegedly referred to as "that nigger." *Id.* Not only was this statement allegedly made by a MRS representative *not* an MPAS representative, it is understood to be a *racial* slur. At the hearing on Defendants' Motions for Summary Judgment, Plaintiff's counsel agreed that this incident, if it happened, has no probabtive bearing on Plaintiff's claim of *disability* discrimination under the ADA.

Second, Plaintiff directs the court to the constant closing and re-opening of her MPAS file. However, Plaintiff misunderstands MPAS' internal process; her MPAS file

---

[5] At the outset, Defendant MPAS argues that it is not a public entity or otherwise an "instrumentality of the state" 42 U.S.C. § 12131(1), and therefore, is not subject to Title II of the ADA. The court is reluctant to conclude that MPAS is not public entity given that it receives 92% of its funding from federal appropriations and grants; however, the court need not decide the merits of this argument as even if MPAS was a public entity, the court finds Plaintiff's claim fails on other grounds.

was never closed and subsequently reopened.[6] Rather, as explained by MPAS counsel at the motion hearing, each time Plaintiff contacted MPAS with a new problem, a file was opened, assigned, investigated, addressed, and eventually closed. There is no dispute or problem evident in this procedure.

Third, Plaintiff cites the mistake MPAS counselor Rose made in the notes in Plaintiff's fifth file and subsequent MPAS counselor Sabourin's reliance on said notes as evidence of discrimination. Rose had incorrectly noted that Plaintiff had a signed IPE with MRS that did not include support for *English 112*. Plaintiff fails to show how this action was anything more than a mistake on Rose's part. Plaintiff provides only one conclusory allegation that Defendant MPAS discriminated against her when it "arbitrarily closed their file under the impression that Plaintiff had a signed IPE." (Dkt. # 24, Pg. ID 725.) Plaintiff incongruously claims MPAS closed her last file "arbitrarily"—i.e., without reason—while explaining in the same sentence the reason MPAS closed her last file: due to a misunderstanding of her IPE status with MRS.

The court refers to Plaintiff's "last file" because Plaintiff had a total of six files with MPAS in each of which MPAS sought to investigate Plaintiff's problem and assist Plaintiff *when possible*. Plaintiff claims that she did not see "any sort of resolution" prior to her last file, but the undisputed facts show that claim to be untrue. (Dkt. #24, Pg. ID 725.) Upon closure of Plaintiff's second file, Plaintiff was successful in obtaining Dr. Sommerschield's letter and in receiving a testing accommodation for the TEP from the

---

[6] Only Plaintiff's MRS file was closed and then subsequently reopened at the direction

Division. During the course of Plaintiff's fourth file, MPAS representatives organized a meeting with Plaintiff and MRS wherein MRS agreed to fund *English 112* once Plaintiff developed an IPE. Given these facts, MPAS' mistaken belief that Plaintiff had a signed IPE with MRS does not demonstrate animus toward her cognitive disability.

Fourth, Plaintiff faults MPAS for not ensuring that the terms of the April 3, 2014 letter were reduced to a written IPE by MRS and for failing to enforce the terms of the letter. Plaintiff disagrees with MPAS' conclusion that it had "no leg to stand on" to argue for enforcement of the terms of the letter. (Dkt. # 24, Pg. ID 714.) Plaintiff argues that MPAS "made unreasonable assertions and took unreasonable actions in determining whether or not Plaintiff had recourse against MRS." (*Id.* at 723.) Plaintiff's complaint is more akin to a legal malpractice or negligence than to an ADA claim; nonetheless, the undisputed evidence shows that MPAS' evaluation of Plaintiff's position was reasonable. Indeed, Plaintiff's argument is that MPAS failed to thoroughly argue on her behalf because it did not advocate for MRS to violate its own written policies: "Policies of institutions are often broken on a case-by-case basis depending on the circumstances and promises made by that institution" (*Id.* at 726-727.) According to Plaintiff, MPAS should have attempted to enforce the terms of the letter "regardless of the written policies of MRS." *Id.* Plaintiff's anger toward MPAS for not advancing a frivolous position on her behalf provides no support for her ADA claim.

In sum, none of the four facts cited by Plaintiff provide evidence that Defendant MPAS discriminated against Plaintiff due to animus toward her cognitive disability.

---

of MRS Manager Dees after Plaintiff appealed the closing.

## B. Title III of the ADA

Title III of the ADA declares,

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation. 42 U.S.C. § 12182(a).

Title III goes on to define discrimination as including in relevant part:

(ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations;

(iii) a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden; 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii).

Title III of the ADA is limited to injunctive relief and does not provide a private party a money damages remedy. *See Smith v. Wal-Mart Stores, Inc.*, 167 F.3d 286, 294 (6th Cir. 1999); *See also Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968) (holding that The Civil Rights Act of 1964 provides only injunctive remedies) and 42 U.S.C. § 12188 (stating that the remedies for a violation of Title III of the ADA are those contained in the Civil Rights Act of

1964). Injunctive relief is appropriate when a party shows "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *See eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

In Defendants' Motions for Summary Judgment, they argue that Plaintiff has not requested any injunctive relief and therefore summary judgment on her Title III claim is appropriate. Plaintiff responds requesting leave to amend her complaint to add injunctive relief.[7] She alleges that there is a "real or immediate threat that [she] will be wronged again." (Dkt. # 24, Pg. ID 723.) However, Plaintiff admits she has already received her bachelor's degree and her interpreter's certification and does not suggest that she will be seeking either MRS or MPAS services in the future.  Further, Plaintiff has not explained the injunctive relief she would seek. Plaintiff does not identify any modifications to MPAS or MRS policy that are necessary to prevent discrimination against persons with cognitive disabilities, nor does she suggest any reasonable accommodations necessary to allow individuals with cognitive disabilities to benefit from MRS or MPAS' services. The court is skeptical that Plaintiff could identify any proper injunctive relief; however, as discussed below, even assuming

---

[7] Plaintiff did not file a motion requesting leave to amend her complaint as is required. (Fed. R. Civ. P. 15(a)(2); Fed. R. Civ. P. 7(b)(1).)

Plaintiff could so identify said relief, her amendment to her complaint would be futile because her Title III ADA claim fails on other grounds.

### 1. Defendant MRS[8]

Plaintiff vaguely asserts that MRS failed to provide her reasonable accommodations in light of her alleged disability.[9] She alleges that "MRS constantly held meetings in large groups where Plaintiff's symptoms were most vulnerable" (Dkt. # 25, Pg. ID 813) and "never took into consideration her disability when forcing Plaintiff to come into stressful meetings in large group settings." (*Id.* at 818.) At the hearing on Defendants' Motions for Summary Judgment, counsel for MRS emphasized that despite Plaintiff's allegations, she has only identified one meeting where more than two individuals besides herself were present in the two years that she sought services from MRS. Even then, Plaintiff does not contend that she requested any type of accommodation from MRS nor does she suggest any accommodations that MRS could have made to assist her. *See MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 344 (6th Cir. 2002) (holding that while an individual must generally request a reasonable

---

[8] Given that all parties agree MRS is a public entity for purposed of the ADA, it is questionable whether Title III applies to MRS. *See The Americans with Disabilities Act: Title II Technical Assistance Manual*, at § II- 1.3000 ("Public entities are not subject to title III of the ADA, which covers only private entities. Conversely, private entities are not subject to title II."). However, since Plaintiff's argument is based on an alleged failure to make reasonable accommodations and is therefore relevant to her Title II claim as well (28 C.F.R. § 35.130(b)(7)(i)), the court will proceed to review the merits of Plaintiff's argument.

[9] The parties dispute whether Plaintiff has a qualifying disability under the ADA. For purposes of resolving the present motions, the court assumes, without deciding, that

accommodation, he need not do so when such request would be "useless" or when the applicable policy is discriminatory on its face).

Moreover, Plaintiff does not explain how such unknown modifications were "necessary to afford" her or other individuals with cognitive disabilities the opportunity to realize the full benefit of MRS' services. *See* 42 U.S.C. § 12182(b)(2)(A)(ii). Indeed, Plaintiff admits that despite these allegedly trying circumstances, she was able to understand the draft IPE presented to her and determine, in her opinion, that it "did not accurately reflect what Defendant had represented." (*Id.*) Additionally, Plaintiff has not explained how MRS' failure to make modifications resulted in her exclusion, denial, segregation, or otherwise different treatment from other individuals. *See* 42 U.S.C. § 12182(b)(2)(A)(iii). In contrast, Plaintiff was treated exactly how a nondisabled individual in her position would have been treated—in accordance with MRS established policy. *See generally Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1015 (6th Cir. 1997) ("[T]he ADA prohibits discrimination between the disabled and the non-disabled; specifically, the ADA mandates that the owners, lessors, and operators of public accommodations provide equal access to the disabled and non-disabled.). She was given abundant resources over the course of two years to develop an IPE including three different counselors and assistance from the MRS site manager. In light of these undisputed facts, the court concludes that Plaintiff has failed to

---

Plaintiff's alleged disability qualifies.

show a reasonable accommodation claim under Title III of the ADA against Defendant MRS.

## 2. Defendant MPAS

Plaintiff provides a single argument based on an intentional discrimination theory in support of her Title II and Title III claims against Defendant MPAS. (See Dkt. # 24, Pg. ID 724.) Title III prohibits a place of public accommodation from discriminating against an individual "on the basis of [her] disability". 42 U.S.C. § 12182(a). Putting aside whether MPAS discriminated against Plaintiff at all, for the reasons discussed *supra* Section III (A)(2), Plaintiff has failed to raise a genuine issue of material fact as to whether any alleged discriminatory action by MPAS was *based on* Plaintiff's alleged cognitive disability.

## C. Plaintiffs' state law claims

Having dismissed Plaintiff's only federal claim, the court declines to exercise jurisdiction over Plaintiff's remaining state law claims and dismisses them without prejudice.  *See* 28 U.S.C. § 1367(c)(3); *see also Gaff v. Fed. Deposit Ins. Corp.*, 814 F. 2d 311, 319 (6th Cir.), on reh'g in part, 828 F. 2d 1145 (6th Cir. 1987) ("It is generally recognized that where, as in this case, federal issues are dismissed before trial, district courts should decline to exercise pendent jurisdiction over state law claims.").

## IV. CONCLUSION

Plaintiff has failed to raise a genuine issue of material fact regarding whether either Defendant violated Title II of the ADA. She has not identified any facts tending to

show that MRS or MPAS denied her services or subjected her to discrimination by reason of her alleged disability. Plaintiff has further failed to raise a genuine issue of material fact regarding whether either Defendant violated Title III of the ADA. She has not provided any argument that it was necessary for MRS to make modifications to its standard procedures to afford Plaintiff the full and equal benefit of said services nor has she shown that MRS' failure to make modifications resulted in her being treated differently than non-disabled individuals. Plaintiff has not identified any facts or evidence to suggest that Defendant MPAS discriminated against her on the basis of her alleged disability. Accordingly,

IT IS ORDERED that Defendants' Motions for Summary Judgment (Dkt. # 21 & 22) are GRANTED as to Count I of Plaintiff's complaint.

IT IS FURTHER ORDERED that Counts II-V of Plaintiff's complaint are DISMISSED WITHOUT PREJUDICE.

s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  November 20, 2017


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, November 20, 2017, by electronic and/or ordinary mail.

s/Lisa Wagner
Case Manager and Deputy Clerk
(810) 292-6522

s/Cleland/Judgesdesk/c2orders/16-14157.Bell-Kacheslki.GrantSJ.aju.RHC